# EXHIBIT A
# (PART 7)

COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

NORFOLK, SS

CIVIL ACTION NO.

| | |
|---|---|
| SOPHIE C. CURRIER on behalf of herself and on behalf of LEA M. GALLIEN-CURRIER, <br> Plaintiffs, <br> <br> v. <br> <br> NATIONAL BOARD OF MEDICAL EXAMINERS, <br> <br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## AFFIDAVIT OF MARSHA WALKER, RN, IBCLC

I, Marsha Walker, on oath, do depose and state the following:

1.      I am a Registered Nurse ("RN") and International Board Certified Lactation Consultant ("IBCLC").  I make this Affidavit based upon my own personal knowledge unless otherwise stated herein.

2.      I have been assisting breastfeeding families in hospital, clinic, and home settings since 1976.  I became an IBCLC in 1985.  I am a Past President of the International Lactation Consultants Association and their representative to the USDA's Breastfeeding Promotion Consortium.

3.      I am also the Executive Director of the Research, Education, and Legal Branch of the National Alliance for Breastfeeding Advocacy and a board member of the Massachusetts Breastfeeding Coalition.

4.      In addition, I have authored more than 60 publications, including articles on the hazards of infant formula use and the marketing of breast milk substitutes in the United States, as well as general resources for practicing nurses and physicians, such as *Breastfeeding Management for the Clinician: Using the Evidence.* I have also delivered over 300 presentations on breastfeeding and breastfeeding related issues.

5.      The American Academy of Pediatrics, the American College of Obstetricians and Gynecologists, Academy of Breastfeeding Medicine, and the American Academy of Family Practice recommend that an infant be exclusively breastfed for the first six (6) months after birth and partially breast-fed for up to at least twelve (12) months of age.

6.      It is well-established in the fields of medicine and public health that breastfeeding improves infants' general health, growth, and development, and significantly decreases the risk of numerous acute and chronic diseases. Breastfeeding also provides long and short-term benefits to mothers who nurse, including accelerated pregnancy-related weight loss and decreased risks of breast and ovarian cancer and osteoporosis. The public health benefits of breastfeeding include decreased health care costs due to reductions in infant morbidity.

7.      A nursing mother of a four month old infant should express breast milk a minimum of every three (3) hours in order to maintain milk production, avoid engorgement, blockage of milk ducts, galactoceles (milk retention cysts), mastitis (an infection of the breast leading caused by the blocking of the milk ducts), and breast abscesses. Incomplete expression of milk may also lead to blocked milk ducts, galactoceals, and mastitis. Engorgement is a particular concern and can become severe,

causing the breasts to redden and become painful. Mothers can even develop a low-grade fever which may signal infection. The milk pooling in engorged breasts also releases chemical signals that decrease milk production. If unrelieved, prolonged engorgement can begin the weaning process or contribute to insufficient milk supply which directly affects the health of the infant.

8.    Electric breast pumps are among the most efficient means by which to express breast milk when not nursing directly, but require the use of a wall outlet or battery pack for operation.

9.    In order to properly express breast milk using a hospital grade breast pump, a nursing mother will require approximately three (3) to five (5) minutes to assemble the breast pump, ten (10) to fifteen (15) minutes to express milk, and five (5) to ten (10) minutes to disassemble and clean the breast pump and to dispense and/or store the expressed milk. In total, a nursing mother will require a total of twenty-five (25) to thirty (30) minutes per pumping session in order to properly express breast milk using an electric pump. It is possible to decrease the total amount of assembly and disassembly time needed to pump breast milk by using extra (clean) pump parts by approximately five to seven minutes.

10.    Use of a breast pump requires a private location because all such pumps require a woman to expose her breasts in order to assemble and to properly position the equipment during the pumping process.

11.    It is recommended that a nursing mother consume additional calories and liquids per day to maintain an adequate milk supply and thus she will require regular trips to the restroom.

12.     Use of a breast pump requires a private location because all such pumps require a woman to expose her breasts in order to assemble and to properly position the equipment during the pumping process.

13.     Although it is possible to eat and/or drink while expressing milk using a breast pump, this is not recommended because it requires the mother to have access to a suitable private space and to configure a chair, table and breast pump so that she could balance the pump flanges while eating.

14.     It is not recommended that a woman use a breast pump to express breast milk using a restroom due to the risk of infection.

15.     To maintain proper hygiene, a nursing mother's hands and the breast pump parts must be cleaned in a sink with potable running water after the pumping process.

16.     Based on my twenty years of experience as an RN, IBCLC, and a breastfeeding consultant and educator, forty-five minutes is insufficient time for a nursing mother of a four month old infant to eat, drink, use the restroom _and_ to fully and properly express breast milk using an electric pump two times over the course of eight hours.

17.     Maternal employment is a major barrier to breastfeeding, especially in the absence of workplace facilities and support. Approximately one-third of mothers return to work three months after the birth of their child. In order to maintain an adequate milk supply and follow medical recommendations to breastfeed exclusively for six months, these mothers must be permitted to express milk using breast pumps while outside of the home and adequate time to do so.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 5th

DAY OF SEPTEMBER, 2007.

_Marsha Walker_
Marsha Walker, RN, IBCLC

5

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION NO.

|  |  |
|---|---|
| SOPHIE C. CURRIER on behalf of herself and on behalf of LEA M. GALLIEN-CURRIER, Plaintiffs, | ) ) ) ) ) |
| v. | ) ) |
| NATIONAL BOARD OF MEDICAL EXAMINERS, | ) ) ) ) |
| Defendant. | ) ) |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### Introduction

Plaintiff Sophie C. Currier ("Ms. Currier") is a thirty-three (33) year old medical student at Harvard Medical School who is scheduled to graduate in November 2007 with a doctorate degree in medicine, having already received a doctorate in neuroscience from Harvard Medical School in November 2004. Upon graduating from Harvard Medical School, Ms. Currier will be eligible for a license to practice medicine in the Commonwealth of Massachusetts and to begin the residency position she has been offered at Massachusetts General Hospital in the field of clinical pathology, her chosen medical specialty. However, in order to obtain her medical degree from Harvard Medical School, Ms. Currier is required to pass the second of three "steps" comprising the United States Medical Licensing Examination ("USMLE") – the administration of which is overseen by Defendant National Board of Medical Examiners ("NBME") – which she is scheduled to take on **September 15, 2007**. Ms. Currier, the mother of a four month old

infant daughter, Plaintiff Lea M. Gallien-Currier, whom Ms. Currier is exclusively breastfeeding, has requested additional "break time" during the eight (8) hour examination in order for her to express breast milk from the NBME. The NBME has repeatedly rejected Ms. Currier's requests.

As set forth more fully in Plaintiffs' Verified Complaint, their Memorandum in Support of Motion for Preliminary Injunction, and the Affidavits of Alison Stuebe, M.D. and Marsha Walker, and exhibits thereto, Ms. Currier requires additional time during the Step 2 Clinical Knowledge ("Step 2 CK") portion of the USMLE examination to use an electric breast pump to express breast milk because the existing "break time" of forty-five minutes allocated to all test-takers – male and female – to eat, drink and use the restroom is insufficient for Ms. Currier to both see to her personal needs *and* to express breast milk using a breast pump. Thus, without injunctive relief requiring the NBME to provide Ms. Currier with additional break time in order to pump breast milk during the examination, Ms. Currier will be irreparably harmed because she will be required to elect whether to use her existing forty five minutes of break time to pump breast milk and *not* eat, drink, and use the restroom, or, on the other hand, *not* pump while she is taking the examination, thereby risking a variety of medical complications such as engorgement, plugged ducts, mastitis, and breast abscesses, and, most importantly, decreased breast milk production which would negatively affect Lea who relies on Ms. Currier as her *sole* source of nourishment. Ms. Currier therefore respectfully requests the Court to grant a preliminary injunction ordering the NBME to provide Ms. Currier with an additional sixty (60) minutes of break time to pump breast milk and a private location in which to do so.

WHEREFORE, Plaintiffs Sophie M. Currier and Lea M. Gallien-Currier respectfully request this Court to issue a temporary restraining order and then a preliminary injunction requiring the NBME to allot Ms. Currier an additional sixty (60) minutes of break time each day during the Step 2 Clinical Knowledge portion of the United States Medical Licensing Examination and to ensure that she is provided with a private room with a power outlet at the testing center in order to express breast milk in privacy.

Respectfully submitted,

SOPHIE C. CURRIER AND LEA M.
GALLIEN-CURRIER
By their attorneys,

Christine S. Collins BBO #639293
Melissa J. Conroy BBO #646932
BOWDITCH & DEWEY, LLP
311 Main Street – P.O. Box 15156
Worcester, MA  01615-0156
(508) 791-3511

Dated:  September 5, 2007

CERTIFICATE OF SERVICE

I, Christine S. Collins, hereby certify that I have served a copy of the foregoing on the following by electronic mail and mailing same, postage prepaid, this 5th day of September, 2007 to:

Joseph F. Savage, Jr.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

_____
Christine S. Collins

COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

NORFOLK, SS                                    CIVIL ACTION NO.

_____
                                          )
SOPHIE C. CURRIER on behalf of herself and )
on behalf of LEA M. GALLIEN-CURRIER,      )
                    Plaintiffs,           )
                                          )
v.                                        )
                                          )
NATIONAL BOARD OF                         )
MEDICAL EXAMINERS,                        )
                                          )
                    Defendant.            )
_____)

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

**Introduction**

Plaintiff Sophie C. Currier ("Ms. Currier") is a thirty-three (33) year old medical student

at Harvard Medical School who is scheduled to graduate in November 2007 with a doctorate

degree in medicine, having already received a doctorate in neuroscience from Harvard Medical

School in November 2004.  Upon graduating from Harvard Medical School, Ms. Currier will be

eligible for a license to practice medicine in the Commonwealth of Massachusetts and to begin

the residency position she has been offered at Massachusetts General Hospital in the field of

clinical pathology, her chosen medical specialty.  However, in order to obtain her medical degree

from Harvard Medical School, Ms. Currier is required to pass the second of three "steps"

comprising the United States Medical Licensing Examination ("USMLE") – the administration

of which is overseen by Defendant National Board of Medical Examiners ("NBME") – which

{Client Files\EMP\306291\0001\PLD\00980715.DOC;1}

she is scheduled to take on September 15, 2007.  Ms. Currier, the mother of a four month old infant daughter, Plaintiff Lea M. Gallien-Currier, whom Ms. Currier is exclusively breastfeeding, has requested additional "break time" during the eight (8) hour examination in order for her to express breast milk from the NBME.  The NBME has repeatedly rejected Ms. Currier's requests.

As set forth more fully herein, Ms. Currier requires additional time during the Step 2 Clinical Knowledge ("Step 2 CK") portion of the USMLE examination to use an electric breast pump because the existing "break time" of forty-five minutes allocated to all test-takers – male and female – to eat, drink and use the restroom, is insufficient for Ms. Currier to both see to her personal needs *and* to express breast milk using a breast pump.  Thus, without injunctive relief requiring the NBME to provide Ms. Currier with additional break time in order to pump breast milk during the examination, Ms. Currier will be irreparably harmed because she will be required to elect whether to use her existing forty five minutes of break time to pump breast milk and *not* eat, drink, and use the restroom, or, on the other hand, *not* pumping while she is taking the examination, thereby risking a variety of medical complications such as engorgement, plugged ducts, mastitis, and breast abscesses, and, most importantly, decreased breast milk production which would negatively affect Lea who relies on Ms. Currier as her *sole* source of nourishment.  Ms. Currier therefore respectfully requests the Court to grant a preliminary injunction ordering the NBME to provide Ms. Currier with an additional sixty (60) minutes of break time to pump breast milk and a private location in which to do so.

**Facts**

The following facts are further detailed in Ms. Currier's Verified Complaint, the Affidavit of Alison Stuebe, M.D., and the Affidavit of Marsha Walker, R.N., filed herewith.

2

## Parties

Ms. Currier is a thirty-three (33) year old resident of Brookline, Massachusetts and the mother of Lea, a four (4) month old infant daughter, who was born on May 1, 2007. (Verified Complaint, ¶ 2.) She is a 1997 graduate of the Massachusetts Institute of Technology, and obtained a Master's degree in toxicology in 1999. Ms. Currier enrolled in a dual doctorate degree program at Harvard Medical School in 1999, and obtained her doctorate in neuroscience in 2004. (Id.) She obtained a scholarship to attend medical school through the Medical Scientist Training Program ("MSTP") funded by the National Institutes of Health ("NIH"). She is scheduled to graduate from Harvard Medical School in November 2007 with her doctorate in medicine, ("M.D."), and has accepted a residency position at Massachusetts General Hospital ("MGH") in the field of clinical pathology. (Id.) Ms. Currier is scheduled to begin her residency position upon graduating from medical school. (Id.)

The NBME is a Pennsylvania non-profit corporation with its principal place of business in Philadelphia, Pennsylvania. (Id., ¶ 3.) The NBME is responsible for administering the USMLE. The NBME is a recipient of federal funds and is responsible for administering the USMLE. The NBME by its very function is a state actor.

### The USMLE Examination

The USMLE is the examination required for medical licensure in all states. (Id., ¶ 4.) It is divided into three "steps" or examinations, each of which must be passed in order to obtain and maintain a license to practice medicine. (Id.) The USMLE is offered at various scheduling and test centers operated by Prometric, a division of Thomson Learning, Inc., ("Prometric"), a Delaware corporation. (Id.)

Step 2 CK is the second "step" of the USMLE and is comprised of approximately 370 multiple-choice test questions distributed equally into eight 60-minute blocks. (Id., ¶ 5.) The Step 2 CK is administered by computer and thus an examinee cannot review or revise their answers to questions in a block they have completed. (Id.) This medical examination is administered in one nine-hour testing session, with eight one-hour blocks of questions, a fifteen minute tutorial at the beginning of the examination, and forty-five minutes of "break" time over the course of the examination during which examinees are permitted to leave the examination room to attend to personal needs, such as eating, drinking, and using the restroom. (Id.) Each examinee may allocate and use the forty-five (45) minutes of break time as needed throughout the testing day. (Id., ¶ 6.) Examinees are not permitted to bring food or drinks into the examination room. (Id.) Candidates are required to sign in and out each time they leave the testing room, but are permitted to roam anywhere they like during their break period, even outside the building in which the test is being administered. (Id.)

Ms. Currier is scheduled to take Step 2 CK at Prometric's Brookline, Massachusetts location at 1330 Beacon Street (the "test site") on September 15, 2007. (Id., ¶ 7.) The examination rooms at the test site are video monitored and are enclosed by glass on three (3) of four (4) sides to permit proctors to observe the examinees. (Id.) Each examinee is assigned to an individual cubicle containing a computer. (Id.) The women's restrooms at the test site are located approximately a one-minute walk from the testing rooms in a hallway that is shared with other businesses and require a key for entry. (Id.)

Because Ms. Currier was diagnosed with both Attention Deficit Hyperactivity Disorder and Dyslexia when she was sixteen (16) years old, she has consistently received "double time" to take standardized examinations, including the USMLE, as well as a separate room. (Id., ¶ 8.) In

4

the case of the Step 2 CK, Ms. Currier will have two days, rather than one, in which to take the Step 2 CK and a separate room which, similar to the main testing room, is also video-monitored and enclosed on three sides with glass walls.  (Id.)

Ms. Currier Is Breastfeeding Her Infant Daughter

The American Academy of Pediatrics, the American College of Obstetricians and Gynecologists, and the American Academy of Family Practice recommend that an infant be exclusively breastfed for the first six (6) months after birth and partially breast-fed for up to at least twelve (12) months of age. (Verified Complaint ¶ 9; Affidavit of Alison Stuebe, M.D. ("Stuebe Aff."), ¶ 3, Exhibits A, B, C; Affidavit of Marsha Walker ("Walker Aff."), ¶ 5.)  It is well-established in the fields of medicine and public health that breastfeeding improves infants' general health, growth, and development, and significantly decreases the risk of numerous acute and chronic diseases. (Verified Complaint ¶ 9; Stuebe Aff., ¶ 4, and Exhibits A, D; Walker Aff., ¶ 6.)  Breastfeeding also provides long and short-term benefits to mothers who nurse, including accelerated pregnancy-related weight loss and decreased risks of breast and ovarian cancer and osteoporosis. (Verified Complaint ¶ 9; Stuebe Aff., ¶ 4; Walker Aff., ¶ 6.)  The public health benefits of breastfeeding include decreased health care costs due to reductions in infant morbidity.  (Id.)  One barrier to breastfeeding includes maternal employment, especially in the absence of workplace facilities and support for breastfeeding. (Verified Complaint ¶ 9; Stuebe Aff., ¶ 12 Walker Aff., ¶ 17. and Exhibit A, p. 3.)

In accordance with these medical recommendations, Ms. Currier has breast-fed her infant daughter exclusively since birth and intends to continue doing so at least until she reaches six (6) months of age. (Verified Complaint ¶ 12.)  On September 15, 2007, Lea will be approximately 4 ½ months old and Ms. Currier will be breast-feeding her approximately every two to three hours.

(Id., ¶ 13.)  A nursing mother of a four month old infant should express breast milk a minimum of every three hours in order to maintain milk production and avoid engorgement, blockage of milk ducts, galactoceles (milk retention cysts), mastitis (an infection of the breast leading caused by the blocking of the milk ducts), and breast abscesses. (Verified Complaint ¶ 11; Stuebe Aff., ¶ 5; Walker Aff., ¶ 7.)  Incomplete expression of milk may also lead to blocked milk ducts, galactoceals, and mastitis.  (Id.)  Engorgement is a particular concern and can become severe, causing the breasts to redden and become painful. (Stuebe Aff., ¶ 5; Walker Aff., ¶ 7.)  Mothers can even develop a low-grade fever which may signal infection.  (Id.)  The milk pooling in engorged breasts also releases chemical signals that decrease milk production.  (Id.)  If unrelieved, prolonged engorgement can begin the weaning process or contribute to insufficient milk supply which directly affects the health of the infant. (Id.)

When Ms. Currier is unable to breast-feed her daughter, she expresses breast milk through the use of an electric breast milk pump, commonly called a "breast pump." (Verified Complaint, ¶ 12; Stuebe Aff., ¶ 5; Walker Aff., ¶ 8.)  Electric breast pumps are among the most efficient means by which to express breast milk when not nursing directly, but require the use of a wall outlet or battery pack for operation. (Verified Complaint, ¶ 12; Walker Aff., ¶ 8.)  In order to properly express breast milk using a hospital grade breast pump, a nursing mother will require approximately three to five minutes to assemble the breast pump, ten to fifteen minutes to express milk, and five to ten minutes to disassemble and clean the breast pump and to dispense and/or store the expressed milk.[1] (Verified Complaint, ¶ 12; Stuebe Aff., ¶ 6; Walker Aff., ¶ 9.) In total, a nursing mother will require a total of twenty-five to thirty minutes per pumping session in order to properly express breast milk using an electric-grade pump.  (Id .)  Use of a

---

[1]       It is possible to decrease the total amount of assembly and disassembly time needed to pump breast milk by using extra (clean) pump parts by approximately five to seven minutes. (Stuebe Aff., ¶ 6; Walker Aff., ¶ 9.)

breast pump requires a private location because all such pumps require a woman to expose her breasts in order to assemble and to properly position the equipment during the pumping process. (Verified Complaint, ¶ 13; Stuebe Aff., ¶ 7; Walker Aff., ¶ 10.)

It is recommended that a nursing mother consume an additional 500 calories and 0.7 liters (23 ounces) of liquids per day to maintain an adequate milk supply and thus, nursing mothers require regular trips to the restroom. (Verified Complaint, ¶ 13; Stuebe Aff., ¶ 8; Walker Aff., ¶ 11.) It is possible to eat and/or drink while expressing milk using a breast pump, however, this is not recommended because it requires the mother to have access to a suitable private space and to configure a chair, table and breast pump so that she could balance the pump flanges while eating. (Verified Complaint, ¶ 13; Stuebe Aff., ¶ 9; Walker Aff., ¶ 13.) It is also not recommended that a woman use a restroom to express breast milk due to the risk of infection. (Verified Complaint, ¶ 13; Stuebe Aff., ¶ 10; Walker Aff., ¶ 14.) Furthermore, to maintain proper hygiene, a nursing mother's hands and breast pump parts must be cleaned in a sink with potable running water after the pumping process. (Verified Complaint, ¶ 13; Stuebe Aff., ¶ 10; Walker Aff., ¶ 145) Forty-five minutes is insufficient time for a nursing mother of a four month old infant to eat, drink, use the restroom *and* to fully and properly express breast milk using an electric pump two times over the course of eight hours. (Verified Complaint, ¶ 13; Stuebe Aff., ¶ 11; Walker Aff., ¶ 16.)

### *Ms. Currier Requests Additional Break Time From the NBME*
### *To Express Breast Milk During The Examination Day.*

On or about June 19, 2007, Ms. Currier sent a written request to the NBME requesting that she be provided an accommodation of additional break time in order to express breast milk during the examination. (Verified Complaint, ¶ 14 and Exhibit 1, correspondence from Ms. Currier to NBME, dated June 19, 2007.) The NBME responded three weeks later, on July 11,

7

2007, rejecting Ms. Currier's request.  (Id., ¶ 14 and Exhibit 2, correspondence from Catherine Farmer to Ms. Currier, dated July 11, 2007.)

On August 10, 2007, Ms. Currier, through counsel, again requested that the NBME provide her with additional break time and a private room in which to express milk.  (Id., ¶ 15 and Exhibit 3, correspondence from Christine S. Collins Esq. to NBME, dated August 10, 2007.) The NBME, through counsel, responded on August 17, 2007, again rejecting Ms. Currier's request, and demanding additional information from Ms. Currier.  (Id. and Exhibit 4, correspondence from Joseph F. Savage, Jr., Esq. to Christine S. Collins, Esq., dated August 17, 2007.)  On August 24, 2007, Ms. Currier responded to the NBME supplying additional information, through counsel.  (Id. and Exhibit 5, correspondence from Attorney Collins to Attorney Savage.)  The NBME responded on August 28, 2007, through counsel, offering some accommodations for Ms. Currier excluding additional time to pump.  (Id. and Exhibit 6, correspondence from Attorney Savage to Attorney Collins, dated August 28, 2007.)

Ms. Currier is required to pass Step 2 CK in order to graduate with her M.D. from Harvard Medical School, to obtain her medical license in Massachusetts, and to begin her clinical pathology residency at Massachusetts General Hospital.  (Verified Complaint, ¶ 16.)  If Ms. Currier does not pass Step 2 CK in September 2007, she faces the loss of her residency position at Massachusetts General Hospital, and, as a result, her career as a physician and researcher, for which she has spent eight (8) years training, will be delayed indefinitely.  (Id.)  A delay of even one year in matriculating to her residency position will injure her professional reputation, ability to earn a living and to fulfill her scholarship obligations, and potential loss of her clinical knowledge and skills.  (Verified Complaint, ¶ 16; Stuebe Aff., ¶ 13.)

{Client Files\EMP\30629130001\PLD\00980715.DOC:1}

Maternal employment is a major barrier to breastfeeding, especially in the absence of workplace facilities and support. (Verified Complaint, ¶ 9; Stuebe Aff., ¶ 12; Walker Aff., ¶ 17.) Approximately one-third of mothers return to work three months after the birth of their child. (Stuebe Aff., ¶ 12; Walker Aff., ¶ 17.) In order to maintain an adequate milk supply and follow medical recommendations to breastfeed exclusively for six months, these mothers must be permitted to express milk using breast pumps while outside of the home and adequate time to do so. (Id.)

With appropriate breastfeeding support, it is possible for a medical student, such as Ms. Currier, to continue her medical career by taking and passing the USMLE, graduating from medical school, and beginning her residency position while breastfeeding her infant daughter. (Stuebe Aff., ¶ 14.) Such support includes adequate time to express milk when she is away from home and a private, sanitary place for her to do so. (Id.) Without such support, it is extremely difficult for a female physician to continue both breastfeeding and pursuing a medical career, requiring a mother to choose between following unanimous medical recommendations to breastfeed and advancing her medical training. (Id.)

The public interest will not be harmed if Ms. Currier is provided with sufficient time to express milk during the Step 2 CK; in fact, the public interest will be harmed if she is not provided with sufficient time to express breast milk during the examination because her advancement as a physician and researcher, funded by the federal government through scholarship monies, will be stunted; potential patients will be denied her services for a period of at least one year; and because women, such as Ms. Currier, will be discouraged from continuing to breastfeed their children after returning to work. (Verified Complaint, ¶ 16; Stuebe Aff., ¶¶ 12, 14; Walker Aff., ¶ 17.)

{Client Files\EMP\30629I\0001\PLD\00980715.DOC:1}

## ARGUMENT

**I.    A PRELIMINARY INJUNCTION SHOULD ISSUE AGAINST THE NBME BECAUSE MS. CURRIER HAS SATISFIED THE REQUIREMENTS FOR INJUNCTIVE RELIEF.**

A.    PRELIMINARY INJUNCTION STANDARD.

To obtain a preliminary injunction, Ms. Currier must show that (1) she has a reasonable likelihood of success on the merits of her claims against the NBME; (2) she will suffer irreparable harm if the injunction is not granted, (3) the harm to Ms. Currier outweighs the injuries to the NBME if the injunction is granted, and (4) the issuance of injunctive relief will not adversely affect the public interest.[2] See Tri-Nel Management, Inc., 433 Mass. at 219; Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980).

As will be demonstrated below, Ms. Currier has established these four elements:  She has shown a likelihood of success on the merits and irreparable harm if the injunctive relief is not granted, and it is clear that the harm Ms. Currier would suffer if the injunction is not granted far exceeds any harm which the NBME might suffer from the issuance of an injunction.  Finally, Ms. Currier has demonstrated that the public interest will *not* be adversely affected if an order requiring the NBME to permit her to express breast milk during the examination issues, *and*, in fact, that the public interest will be adversely affected if injunctive relief *does not* issue.

---

[2]    Because the NBME is a state actor, this Court must consider whether the relief sought will adversely affect the public.  See Tri-Nel Management, Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001).

{Client Files\EMP\306291\0001\PLD\00980715.DOC;1}

B.   MS. CURRIER HAS A REASONABLE LIKELIHOOD OF SUCCESS ON HER
     CLAIMS AGAINST THE NBME.

    1.   **The NBME's Refusal To Allot Ms. Currier Sufficient Time To Express
     Breast Milk During Step 2 CK Abridges Her Constitutional Right To
     Privacy In Violation of 42 U.S.C. § 1983, The Massachusetts Declaration Of
     Rights, And The Massachusetts Civil Rights Act.**

        *a.   The NBME's Policy Abridges Ms. Currier's Constitutional Right To Privacy
     Protected By The Due Process Clause Of The Fifth And Fourteenth
     Amendments And The Massachusetts Constitution.*

Breastfeeding has been recognized by at least two federal courts to be a fundamental right

protected by the United States Constitution.  See Dike v. School Bd. of Orange County, 650 F.2d

783 (5th Cir. 1981), *overruled on other grounds by* Shahar v. Bowers, 114 F.3d 1097, 1102-1103

(11th Cir. 1997)[3]; see also Berrios-Berrios v. Thornburg, 716 F. Supp. 987 (D.Ky. 1989).  In

Dike, a school teacher challenged the district court's dismissal of her claim that the refusal by the

school board to permit her to breastfeed her child during her duty-free lunch period on the

grounds constituted undue state interference with her fundamental right to privacy.  650 F.2d at

784.  The Fifth Circuit reversed the district court's dismissal of plaintiff's claims, concluding that

"the Constitution protects from excessive state interference a woman's decision respecting her

breastfeeding her child," because "[b]reastfeeding is the most elemental form of parental care[]

[i]t is a communion between mother and child that, like marriage, is 'intimate to the degree of

---

[3]      At the time of the Dike decision in July 1981, the Fifth Circuit Court of Appeals had jurisdiction
over six states, Louisiana, Texas, Mississippi, Alabama, Florida and Georgia.  On October 1, 1981, Congress
divided the Fifth Circuit into two smaller circuits, leaving Alabama, Florida and Georgia under the jurisdiction of
the Fifth Circuit and creating a new circuit, the Eleventh Circuit Court of Appeals, with jurisdiction over Louisiana,
Texas and Mississippi.  The decision of the Eleventh Circuit Court of Appeals in Shahar v. Bowers, which purports
to "overrule" the Fifth Circuit Court of Appeals' decision in Dike that strict scrutiny does not apply to a government
employee's freedom of intimate association claims, has no bearing on the instant case.  Shahar deals with the
government's withdrawal of a job offer to an individual based on her lesbian marriage.  The case at bar does not
arise within the employment context, so Shahar's refusal to apply strict scrutiny is of no actual consequence.  More
importantly, Shahar did *not* refute the recognition in Dike of the fundamental privacy right implicated in
breastfeeding one's child: *that* is the right this Court is urged to recognize and to treat the abridgement of with strict
scrutiny – not because Dike suggests that approach – but because Massachusetts case law involving fundamental
rights (discussed *infra*) *requires* that level of scrutiny.

being sacred." 650 F.2d at 784, citing Griswold v. Connecticut, 381 U.S. 479, 484 (1965).

In Berrios-Berrios v. Thornburg, the District Court for the District of Kentucky likewise recognized that a woman possesses a fundamental interest in her decision to breast feed her child. 716 F.Supp. at 990. In that case, the plaintiff, an inmate in federal prison, sought an injunction against the prison requiring it to permit her to breast feed her infant daughter during normal visitation hours and to store breast milk she expressed through the use of a breast pump in prison refrigerators. Citing Dike, the Kentucky District Court found that the plaintiff's right to breast-feed her daughter was constitutionally protected. 716 F. Supp. at 991. The Court also found that the plaintiff had met the remaining requirements for preliminary injunctive relief, including that (1) the plaintiff would suffer irreparable harm if she were not permitted to breast-feed her daughter, (2) the harm to the plaintiff and her infant daughter outweighed the state's interests in preventing plaintiff from doing so, and, finally, (3) as to any harm to the public interest, "it will be a very sad day in America when allowing a mother to breast-feed her infant disserves the public interest." Id.

Finally, in a case analogous to the one at bar, one appellate level state court, the Supreme Court of the State of Montana, recognized a law student's right to breastfeed as a protected privacy right and required the Montana Board of Bar Overseers to provide her with a private room to take the bar examination in order for her to breastfeed her four-month old infant in two hour increments during the test. See Order from the Supreme Court of the State of Montana entitled In Re The Request For Accommodation Of Cassandra Coleman For The July 2005

12

Montana Bar Examination, No. 05-304, dated June 22, 2005, attached hereto as Exhibit 1.[4]

Each of the cases cited above supports the finding that Ms. Currier possesses a fundamental right to breastfeed her infant daughter, a right that is protected from unwarranted state intrusion by the United States Constitution and the Massachusetts Declaration of Rights. Specifically, as found by the Dike and Berrios-Berrios courts, the Fourteenth Amendment's due process clause protects certain basic values such as the right of personal privacy or "'fundamental' personal liberties.'" Dike, at 785-786, and cases cited therein; Berrios-Berrios, 716 F. Supp. at 990. The United States Supreme Court has long-recognized that the protections of the Fourteenth Amendment extend to activities involving "child rearing and education." See Pierce v. Society of Sisters, 268 U.S. 510, 535 (1925); Meyer v. Nebraska, 262 U.S. 390, 399 (1923). An additional, if not stronger, source of protection for an individual's liberty interests is found in Articles 1, 10 and 12 of the Massachusetts Declaration of Rights. See Mass. Decl. Rts., Art. I. (citing the right to "enjoy[] and defend[] their lives and liberties," and "seeking and obtaining their safety and happiness.") See also Goodridge v. Dept. of Public Health, 440 Mass. 309, 328 (2003) (concluding that barring an individual from the protections, benefits, and obligations of civil marriage solely because that person would marry a person of the same sex violated the Massachusetts Constitution); Planned Parenthood League of Mass., Inc. v. Attorney Gen., 424 Mass. 586, 590 (1997) (overturning dual parental consent provision of minor abortion

---

[4]      It is noteworthy that the law student in that case requested, *by way of alternative relief,* additional time to express milk during the course of the bar examination and that the Supreme Court of Montana found that such additional time was unnecessary *because* of its finding that the Montana Board of Bar Examiners must provide her with a private room in which she could breast feed her child "in privacy and on her own schedule." In re Coleman, at p. 1. Specifically, in that case, the law student sought to parallel her four (4) month old infant's feeding schedule during the bar examination by taking a twenty (20) minute break every two (2) hours (which did not count towards her total exam time) in order to leave the exam room, pump breast milk, and return to the testing room. The Montana bar examination, unlike Step 2 CK, was administered in several three- or four-hour blocks over the course of three days. (See "Verified Petition for Accommodation," attached hereto as Exhibit 2, at p. 2 and Exhibit 1 thereto.) By contrast, Step 2 CK will be administered to Ms. Currier in eight (8) one hour blocks with only forty-five minutes of break time throughout each testing day.

{Client Files\EMP\306291\0001\PLD\00980715.DOC;1}

notification law). Massachusetts likewise recognizes a parent's interest in conceiving and raising her child as a fundamental right. Dep't of Public Welfare v. J.K.B., 379 Mass. 1, 3 (1979). It is difficult to conceive of a parental decision more fundamental and private than choosing to breastfeed an infant. See Dike, at 786-787; Berrios-Berrios, at 990. As such, Ms. Currier's decision to breastfeed her infant daughter is protected from undue state interference by the due process clauses of the Fifth and Fourteenth Amendments and the Massachusetts Declaration of Rights.

It is equally well-settled that if a statute or action by a state actor either burdens the exercise of a fundamental right protected by the federal Constitution or the Massachusetts Constitution, or discriminates on the basis of a suspect classification, then that statute or action is subject to strict judicial scrutiny. See Troxel v. Granville, 430 U.S. 57, 66 (2000); Blixt v. Blixt, 437 Mass. 649, 655-656, 660-661 (2002), cert. denied, 537 U.S. 1189 (2003). This "strict scrutiny" analysis traditionally is stated in terms of requiring (1) a legitimate and compelling state interest to justify the statute or state action, and (2) careful examination to ascertain whether the action taken was "narrowly tailored to further [that] interest." See Republican Party of Minn. v. White, 536 U.S. 765, 774-775 (2002); Blixt, 437 Mass. at 656.

Here, there can be no doubt that the NBME is a "state actor" and that its refusal to grant Ms. Currier additional time to express breast milk during the USMLE is subject to strict scrutiny analysis. As an initial matter, the NBME was established for the *sole* purpose of creating and administering one exclusive licensing examination for all physicians in the United States, which would be relied upon by the medical licensing authorities of *all* states. Its website states, specifically, that the NBME was "founded in 1915 because of the need for a voluntary, nationwide examination that medical licensing authorities could accept as the standard by which

14

to judge candidates for medical licensure." See http://www.nbme.org/about/index.html, a true
and accurate copy of which is attached hereto as Exhibit 1. Almost one hundred years later, the
NBME still serves that function; *all* individuals seeking a state license to practice (allopathic)
medicine in the United States *must* take and pass the USMLE in order to satisfy the examination
requirements for state licensure. See Donald E. Melnick, M.D.; Gerard F. Dillon, Ph.D.; David
B. Swanson, Ph.D., *Medical Licensing Examinations in the United States*, 55 Journal of Dental
Education 595 (2002).[5] Furthermore, because (1) medical licensing is a power reserved
exclusively to the state, see M.G.L. c., 112 §§ 2-9 (setting forth requirements for licensure as a
physician in Massachusetts); M.G.L. c., 13 § 10 (establishing Massachusetts Board of
Registration of Medicine ("Board of Registration of Medicine")), and, (2) in the exercise of its
licensing power, the Board of Registration in Medicine must rely on and – does, in fact, rely on –
results of the USMLE, the NBME – as the administrator and registering entity of the sole
American medical licensing examination – undeniably serves a public function and is
inextricably linked with the issuance of licenses to practice allopathic medicine by the
Commonwealth.

Finally, case law involving private entities exercising "public functions" strongly
supports a finding that the NBME is a state actor for purposes of the federal Constitution and
Massachusetts Declaration of Rights. The United States Supreme Court has found state action
where, as here, a *private* entity exercises powers traditionally exclusively reserved to the State.

---

[5]        Formerly called the "National Board Examination," the USMLE now represents the single,
uniform examination for medical licensure in the United States. It replaced the Federation Licensing Examination
(FLEX) and the NBME "Board" exams. See www.urmc.rochester.edu/smd/stdnt/handbook/USMLE.html, attached
hereto as Exhibit 3. Passing the USMLE is a requirement for licensure in Massachusetts and, additionally, for
graduation from Harvard Medical School. See "Licensure" at www.hms.edu/admissions, attached hereto as Exhibit
4; Commonwealth of Massachusetts, Board of Registration in Medicine Full License Application Instructions,
www.massmedboard.org, attached hereto as Exhibit 5.

15

See, e.g., Terry v. Adams, 345 U.S. 461 (1953) (election); Evans v. Newton, 382 U.S. 296 (1966) (municipal park). Likewise, the NBME exercises a medical licensing function – namely, testing of all candidates for medical licenses in the United States – which is traditionally exclusively reserved to the Board of Registration of Medicine, but delegated by that Board to the NBME. As such, the NBME is a state actor to whom the conduct requirements of the federal Constitution and the Massachusetts Declaration of Rights apply.

In addition, the NBME's policy with respect to nursing mothers cannot survive strict scrutiny analysis. In applying the strict scrutiny formula to the instant case, this Court must examine the NBME's articulated compelling interest, if any, in justifying its refusal to accommodate Ms. Currier's physical need and desire to express milk during the Step 2 CK and whether the NBME's policy is "narrowly tailored" to further that interest. First, the NBME may cite as a compelling interest the need to maintain uniformity, standardization and fairness of the Step 2 CK and USMLE because it is the sole licensure examination in the United States. See Verified Complaint, ¶ 15 and Exhibits 4, 6.) However, this need is little more than academic. The NBME grants accommodations, such as "double time" and a separate room as in this case, to examinees who suffer from disabilities. Therefore, *as a practical matter*, granting an accommodation to a nursing mother such as Ms. Currier by allowing her sufficient time to express breast milk and to attend to her other personal needs during the examination differs little from addressing the need for an accommodation attendant to a disabled examinee. Similarly, it is absurd to suggest that the Step 2 CK will be "unfair" if Ms. Currier is allowed extra time to pump breast milk, or that she will obtain an unfair advantage over her fellow examinees if she is permitted additional time, because Ms. Currier's additional break time will be dedicated *solely* to the twenty-five to thirty-minute process of expressing breast milk using a breast pump, including

16

walking to and from a separate private room designated for pumping.  Furthermore, the additional time will not permit her time to reconsider her prior answers on the examination, as she is precluded from reviewing any questions she completed in a prior block of questions.  (Id.) In addition, the fact that the NBME does not grant additional time to those with conditions that have "[un]comfortable or [in]convenient" gastrointestinal or genitourinary symptoms because they are *not* covered by the ADA ignores the fact that breastfeeding, unlike medical conditions not covered by the ADA, is a fundamental right.  (See Verified Complaint, ¶ 15 and Exhibit 6.) (See *supra,* § B(1)(a), at pp. 11-14.)

Furthermore, for the same reasons, the NBME's conduct in refusing to provide Ms. Currier with sufficient time to express breast milk fails the second prong of the strict scrutiny test.  Concerns about uniformity, unfairness, or de-standardization of the examination resulting from providing Ms. Currier with an accommodation for her and her daughter's breast feeding schedule are readily overcome by standardizing the NBME's response to requests such as Ms. Currier's, i.e. merely providing thirty extra minutes of time per nursing session to be used as needed during the testing day.  Likewise, any concern of cheating during the examination can be no greater than already exists since examinees are permitted during their break time to leave the testing room and roam anywhere they wish, even outside the test site, provided they do not exceed their total of forty-five minutes of break time.  (Verified Complaint, ¶ 6.)  Finally, Ms. Currier will be occupied during the additional break time with the pumping process and will be unable to revise her prior answers.  (Verified Complaint, ¶ 5; Stuebe Aff., ¶ 12; Walker Aff., ¶ 13.)

b.     *The NBME's Refusal To Accommodate Ms. Currier's Right To Breastfeed Her Daughter Violates The Massachusetts Civil Rights Act.*

The Massachusetts Civil Rights Act ("MCRA") further protects "any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with" by threats, intimidation, or coercion.  M.G.L. c. 12, §§ 11H-11I. "Coercion" within the meaning of the MCRA includes economic coercion and requires the application to another of such physical or moral force so as to constrain him to do something against his will or something he would not otherwise have done.  See Buster v. Moore, Inc., 438 Mass. 635, 637 (2003) (recognizing coercion by economic means under G.L. c. 12, §§ 11H-11I). See also Smith v. Stechel, 510 F.2d 1162, 1164 (9th Cir. 1975) (section of Federal statute making it unlawful to "coerce, intimidate, threaten or interfere" was applicable where employer allegedly fired employees for renting apartments to members of minority groups); United States v. Beaty, 288 F.2d 653, 656 (6th Cir. 1961) (threats to evict tenants-sharecroppers and to refuse to deal with them in good faith if they exercised their right to vote would constitute coercion); Jones v. Boston, 738 F. Supp. 604, 605 (D. Mass. 1990) (bartender's alleged use of racial slur directed at patron sufficient to state claim under act).

As discussed more fully supra, § B(1)(a), at pp. 11-14, Ms. Currier enjoys a right to breast feed her daughter that is protected by the Fourteenth Amendment's due process clause and the Massachusetts Declaration of Rights.  In refusing to provide Ms. Currier with sufficient time to exercise this right by expressing milk during Step 2 CK, the NBME is interfering with Ms. Currier's constitutionally protected rights through economic coercion in violation of the MCRA. Specifically, passing the Step 2 CK is the gateway through which Ms. Currier must pass in order to pursue her medical career, including graduating from medical school, obtaining her license to

18

practice medicine in Massachusetts, and beginning her clinical pathology residency at MGH. The NBME is, in effect, interfering with Ms. Currier's ability to achieve these professional goals, indeed her livelihood, by requiring her to take Step 2 CK without sufficient time to exercise her constitutionally protected right to express breast milk. As such, Ms. Currier has demonstrated that she is likely to succeed on her claim that the NBME's conduct constitutes a violation of MCRA.

### 2. The NBME's Conduct Constitutes Discrimination On The Basis Of Sex In Violation Of The Massachusetts Equal Rights Amendment.

The Massachusetts Equal Rights Act (MERA) provides, in pertinent part, that "[a]ll persons within the commonwealth, regardless of sex, race, color, creed or national origin, shall have . . . the same rights enjoyed by white male citizens."[6] M.G.L. c. 93, § 102(a). This Court *must* find a violation of MERA if in the "totality of the circumstances," Ms. Currier demonstrates that the NBME has denied rights accorded to her under this section. G.L. c. 93, § 102(c).

Under MERA, sex-based classifications are subject to the same degree of scrutiny as racial classifications required by the Fourteenth Amendment. See Brackett v. Civil Service Commission, 447 Mass. 233, 247 (2006), quoting Attorney Gen. v. Massachusetts Interscholastic Athletic Ass'n, 378 Mass. 342, 354 (1979). In other words, a classification based on gender "will be upheld *only if* a compelling interest justifies the classification *and* if the impact of the classification is limited as narrowly as possible consistent with its proper purpose." Id., *citing* Lowell v. Kowalski, 380 Mass. 663, 666 (1980). Further, unlike federal courts, the Massachusetts Supreme Judicial court has rejected sex/gender-based classifications where the classification affects *only* women, as in this case. Specifically, in Mass. Electric Co. v. Mass.

---

[6]      MERA further provides that any person whose rights pursuant to this section are violated may bring a civil action for injunctive relief and/or other equitable relief and is entitled to an award of costs and reasonable attorneys' fees if a violation is found to have occurred. M.G.L. c. 93, §§ 102(b), (d).

19

Comm. Against Discrimination, which addressed the exclusion of benefits for pregnancy-related disabilities from a comprehensive disability plan, the Supreme Judicial Court stated that "[p]regnancy is a condition unique to women, and the ability to become pregnant is a primary characteristic of the female sex. Thus any classification which relies on pregnancy as the determinative criterion is a distinction based on sex" and "placing pregnancy in a class by itself discriminates on account of sex; for it is the capacity to become pregnant which primarily differentiates the female from the male." 375 Mass. 160, 167-168 (1978) (interpreting G.L.c. 151B, § 4 to require the inclusion of pregnancy-related disabilities in a comprehensive disability plan, thus imposing a higher duty than that existing under Federal law as articulated in General Electric Co. v. Gilbert, 429 U.S. 125 (1976)).

Here, the NBME's policy constitutes a violation of MERA as it is impermissible sex discrimination. First, there can be no dispute that, by the conduct at issue in this case, the NBME has impermissibly created a classification based on sex and gender. Specifically, in refusing to provide Ms. Currier with sufficient time in which to express breast milk during Step 2 CK *and* to eat, drink, and use the restroom, the NBME is treating a class of persons – namely, nursing women – differently from their male counterparts because no male examinees can give birth, breastfeed an infant, or express milk using a breast pump. The NBME's argument that it treats all individuals with temporary disabilities equally, regardless of gender, misses the point. (See Verified Complaint, ¶ 15, Exhibit 6, at p. 2.) The protected class of persons is not those with temporary disabilities, but, rather, those who are women *and* nursing. Thus, the NBME is requiring Ms. Currier to choose between expressing milk during the examination and attending to her personal needs, a choice *no male test candidate* must face.

20

Second, for the reasons described _supra_, at § B(1)(a), pp. 16-17, the NBME cannot prove it has a compelling interest which justifies this sex/gender-based classification _and_ that "the impact of the classification is limited as narrowly as possible consistent with its proper purpose." See Brackett, 447 Mass. at 247. As to any interest the NBME has in maintaining a policy which is inimical to nursing women for "fairness" or "standardization" reasons, this interest is, as a practical matter, a red herring because the NBME is capable of accommodating nursing mothers such as Ms. Currier without jeopardizing these interests in much the same way it has successfully maintained uniformity, fairness, and standardization in accommodating examinees suffering from disabilities. Similarly, as to fairness, Ms. Currier -- like those examinees with disabilities -- is not unfairly advantaged by virtue of an additional sixty minutes to express breast milk during the course of the examination; rather, she will be occupied with attending to a basic human function, the release of the painful engorgement in her breasts through the use of a breast pump and the functional details associated with that process. (See Steube Aff., ¶ 5-10; Walker Aff., ¶ 7-16.) Finally, even if, _arguendo_, the NBME's interests in uniformity, fairness, and standardization are compelling, which Ms. Currier disputes, its policy of refusing additional time to Ms. Currier is not truly narrowly-tailored to serve that interest because the NBME already provides accommodations to disabled examinees which exceed the conditions imposed on all examinees. Thus, a policy that effectively precludes Ms. Currier from being able to express breast milk during the examination is not narrowly-tailored to serve the interests of maintaining fairness and equal conditions for all test-takers. Accordingly, the NBME's refusal to provide sufficient time for Ms. Currier, a nursing woman, to express breast milk constitutes discrimination on the basis of sex.

21

3.    **The Massachusetts Public Accommodation Act Also Prohibits The NBME**
      **From Discriminating Against Ms. Currier On The Basis Of Her Sex.**

The Massachusetts Public Accommodation Act, M.G.L. c. 272 § 92A makes unlawful

discrimination on the basis of sex, *inter alia*, and provides in section 98, in pertinent part, that:

> [w]hoever makes any distinction, discrimination or restriction on account of race,
> color,  religious creed, national origin, sex, sexual orientation…deafness,
> blindness or any physical or mental disability or ancestry relative to the admission
> of any person to, or his treatment in any place of public accommodation, resort or
> amusement, as defined in section ninety-two A, or whoever aids or incites such
> distinction, discrimination or restriction… shall be liable to any person aggrieved
> thereby for such damages as are enumerated in section five of chapter one
> hundred and fifty-one B…All persons shall   have the right to the full and equal
> accommodations, advantages, facilities and privileges of any place of public
> accommodation, resort or amusement subject only to the conditions and
> limitations established by law and applicable to all persons. This right is
> recognized and declared to be a civil right.

M.G.L. c. 272, § 98.  Massachusetts courts have not "narrowly defined" the term "place[] of

public accommodation," and the term does not have any "special meaning aside from its

common definition." U.S. Jaycees v. Mass. Comm. Against Discrimination, 391 Mass. 594,

601-02 (1984).  Further, as used in G.L. c. 272, § 92A, "place" is not a "technical" term

according to the legislative history of that statute, but, rather, is interpreted according to its basic

meaning, i.e. a "locality, situation or site and it is also used to designate an occupied situation or

building." Id.

Here, the NBME is undeniably a place of public accommodation, and its policy denies

Ms. Currier the "full enjoyment of [its] . . . advantages, facilities [and] privileges offered to the

general public." M.G.L. c. 272, § 92A.  First, the examination administered and co-owned by

the NBME, the USMLE, is required of all medical students for licensure in all of the states,

including Massachusetts.  (Verified Complaint, ¶ 4.)  Next, because of its nature as a licensing

examination, the USMLE is offered at various test sites throughout the United States; in this

22

case, the test site is located in a building that is open to the public, akin to a loan office.  (Id.)
See Local Fin. Co. v. Massachusetts Comm'n Against Discrimination, 355 Mass. 10 (1968)
(place of public accommodation includes a loan office.)  Finally, the effect of the NBME's
policy is to penalize Ms. Currier because of her sex/gender by refusing to allow her sufficient
time to express milk using a breast pump _and_ to attend to her personal needs.  By contrast, other
non-lactating examinees are given forty-five minutes for purposes to attend to their personal
needs.  As such, the NBME, a place of public accommodation, is clearly engaging in
discrimination against Ms. Currier on the basis of her sex/gender, and a preliminary injunction
requiring the NBME to accommodate Ms. Currier must issue.  See Mass. Electric Co., 375 Mass.
at 168 (declaring that exclusion pregnancy-related disabilities from comprehensive disability
plan benefits constitutes discrimination).

C.    MS. CURRIER WILL SUFFER IRREPARABLE HARM IF THE NBME IS NOT
      REQUIRED TO ACCOMMODATE HER NEED TO EXPRESS MILK DURING
      THE STEP 2 CK, AND THAT HARM OUTWEIGHS ANY HARM TO THE
      NBME SHOULD INJUNCTIVE RELIEF ISSUE IN HER FAVOR.

In addition to demonstrating that she is likely to succeed on her substantive claims
against the NBME, Ms. Currier must also prove, as she can, that she will suffer irreparable harm
if the requested relief does not issue and that such harm outweighs any harm the NBME may
suffer if an injunction is granted.

As a result of the NBME's conduct, Ms. Currier is faced with the truly Hobbesian
choice of whether, on the one hand, to eat, drink, and use the restroom during her forty-five
minutes of break time during the examination, or, on the other hand, to use the break time to
express milk using a breast pump because forty-five minutes is insufficient time for her to do so.
(Verified Complaint, ¶ 13; Stuebe Aff., ¶ 11; Walker Aff., ¶ 16.)   The harm to Ms. Currier if
she chooses to pump breast milk during her forty-five minutes of break time is that she will be

23

unable to eat, drink, and use the restroom for eight hours during the two days of the Step 2 CK. (Verified Complaint, ¶ 6, 13; Stuebe Aff., ¶ 9-11; Walker Aff., ¶ 13-14, 16.)   If Ms. Currier chooses the second alternative, that she eats, drinks, and uses the restroom during the forty-five minute break, she – and her daughter – will be harmed because Ms. Currier's milk supply will diminish, she will suffer engorgement, and she will run the risk of several medical complications, including clogged milk ducts, galactoceals, and mastitis. (Verified Complaint, ¶ 11; Stuebe Aff., ¶ 5; Walker Aff., ¶ 7.)   Under either scenario, Ms. Currier faces the very real risk that she will fail Step 2 CK, thereby jeopardizing her residency position at MGH; her professional reputation; her ability to earn a living and to begin fulfilling her MSTP scholarship obligation and repaying her medical school loans; and potentially diminishing her clinical knowledge and skills. (Verified Complaint, ¶ 16; Steube Aff., ¶ 13.)

Finally, Ms. Currier will also suffer irreparable harm should the NBME argue that expressing milk is another personal need similar to the need for sustenance and to relieve oneself, and that the forty-five minutes allotted to all examinees is sufficient time to pump breast milk _and_ to eat, drink, and use the restroom, because (1) there is insufficient time for her to properly pump for thirty minutes two times during each testing day, a necessary regimen in order to maintain milk production, avoid engorgement, blocked milk ducts, galactoceles, mastitis, and breast abscesses, (Verified Complaint, ¶ 11; Stuebe Aff., ¶ 5; Walker Aff., ¶ 7); (2) although it is possible to eat and/or drink while expressing milk using a breast pump, it is not recommended, (Verified Complaint, ¶ 13; Stuebe Aff., ¶ 9; Walker Aff., ¶ 13); (3) it is not recommended that a woman use a breast pump to express breast milk while using a restroom due to the risk of infection, (Verified Complaint, ¶ 13; Stuebe Aff., ¶10; Walker Aff., ¶ 14); and (4) she needs to use the restroom more frequently due to increased caloric and liquid intake requirements,

24

(Verified Complaint, ¶ 13; Stuebe Aff., ¶ 8; Walker Aff., ¶ 11); and (5) she will face increased risk of infection unless she extends her time in the restroom to clean her pump, (Verified Complaint, ¶ 13; Stuebe Aff., ¶ 10; Walker Aff., ¶ 15).

By contrast, the harm to the NBME should this Court grant Ms. Currier's requested relief is minimal, at best. The NBME cannot be heard to argue that it is administratively incapable of providing such an accommodation because it has demonstrated its capacity to provide adjusted test schedules to individuals, such as Ms. Currier, needing accommodations to testing schedules for disabilities. (See Verified Complaint, at Exhibits 4 and 6.) Similarly, Ms. Currier will not be given any additional advantage because (1) Ms. Currier's additional time will be dedicated to the pumping process, (2) all examinees are permitted to leave the test site during their break time, and (3) examinees are unable to review their answers on any section of the test they previously completed. (Verified Complaint, ¶¶ 5, 11-13.) Finally, any fairness, standardization, or similar concerns are obviated for the same reasons. In sum, the balancing of the equities favors Ms. Currier because the potential for irreparable harm to Ms. Currier if she is not permitted sufficient time to express milk during Step 2 CK is substantial, while the harm to the NBME, if any, is negligible.

D.   THE PUBLIC INTEREST WILL NOT BE ADVERSELY AFFECTED BY THE ISSUANCE OF INJUNCTIVE RELIEF IN FAVOR OF MS. CURRIER; RATHER, THE PUBLIC INTEREST *FAVORS* AN INJUNCTION.

The last prong of the preliminary injunction analysis requires Ms. Currier to demonstrate that the public interest will not be injured should this Court issue an injunction in her favor. See Tri-Nel Management, Inc., 433 Mass. at 219. For many of the same reasons as those set forth supra, at § II (C), pp. 23-25, the public interest in maintaining fairness and standardization of the USMLE will not be harmed if Ms. Currier is granted time to pump breast milk during Step 2 CK.

Furthermore, as the District Court for the District of Kentucky stated in <u>Berrios-Berrios</u> when it found that allowing the plaintiff to breastfeed her daughter while incarcerated would not harm the public interest, "it will be a very sad day in America when allowing a mother to breast-feed her infant disserves the public interest." 716 F. Supp. at 991.

To the contrary, the public interest _will_ be harmed if Ms. Currier does not have enough time to express breast milk during the examination. As an initial matter, the promotion of breastfeeding is in the public interest because of the well-established medical benefits to infants, nursing mothers, and the public health as a whole. (Stuebe Aff., ¶ 4; Walker Aff., ¶ 6.) Furthermore, the medical profession and the public will benefit from the promotion of Ms. Currier, a qualified female medical student and MSTP scholarship recipient, to her residency position. Ms. Currier's career and contributions as a physician and researcher, funded by the NIH through scholarship monies, will be delayed. In addition, potential patients will be denied her services for a period of at least one year. Moreover, women, such as Ms. Currier, will be discouraged from continuing to breastfeed their children after returning to work, thereby defeating the public health interest in breastfeeding. (Verified Complaint, ¶ 16; Stuebe Aff., ¶¶ 4, 12, 14; Walker Aff., ¶¶ 6, 17.) Finally, the public benefits when violations of fundamental constitutional rights, such as breastfeeding, and laws prohibiting discrimination, such as on the basis of sex or gender, are _eliminated_. Because Ms. Currier has demonstrated that the public interest will not be harmed should she be granted sufficient time to pump breast milk during the Step 2 CK, injunctive relief against the NBME is proper in this instance.

## CONCLUSION

For the foregoing reasons, Plaintiffs Sophie C. Currier and Lea M. Gallien-Currier respectfully requests this Court to issue an injunction requiring the NBME to provide Ms. Currier with an additional sixty minutes of break time each day during the Step 2 CK in order to express milk and a private room in order to do so.

Respectfully submitted,

SOPHIE C. CURRIER
By her attorneys,

Christine S. Collins (BBO # 639293)
Melissa J. Conroy (BBO # 646932)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156
Ph.: (508) 926-3441
Fax: (508) 929-3041

Dated:  September 5, 2007

## CERTIFICATE OF SERVICE

I, Christine S. Collins, hereby certify that I have served a copy of the foregoing on the following by electronic mail and mailing same, postage prepaid, this 5th day of September, 2007 to:

Joseph F. Savage, Jr.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

Christine S. Collins

27

{Client Files\EMP\306291\0001\PLD\00980715.DOC;1}

<u>CERTIFICATE OF SERVICE</u>

I, Christine S. Collins, hereby certify that I have served a copy of the foregoing on the following by electronic mail and mailing same, postage prepaid, this 5th day of September, 2007 to:

Joseph F. Savage, Jr.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

Christine S. Collins